## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| IN RE:<br><br>**RONALD WADE JAQUES,**<br><br>    **Debtor.** | **Case No. 18-01092-TLM** |
| **T STREET LLC, an Idaho limited liability company; DOHENY LLC, an Idaho limited liability company; TRESTLES LLC, an Idaho limited liability company; OAKLANDS LLC, an Idaho limited liability company; EJC LLC, an Idaho limited liability company; EUDA LLC, an Idaho limited liability company; TAMMARA HERON, trustee of the Heron Family Trust; and SILVER FOX MANAGEMENT LLC, an Idaho limited liability company,**<br><br>    **Plaintiffs,**<br><br>v.<br><br> **RONALD WADE JAQUES,**<br><br>    **Defendant.** | **Adv. No. 18-06031-TLM** |

## MEMORANDUM OF DECISION

MEMORANDUM OF DECISION - 1

## I.    INTRODUCTION

In this adversary proceeding, T Street LLC, Doheny LLC, Trestles LLC, Oaklands LLC, EJC LLC, EUDA LLC, Tammara Heron as trustee of the Heron Family Trust, and Silver Fox Management LLC (collectively "Plaintiffs")[1] seek a determination that debts are owed Plaintiffs by Paradigm Property Solutions, LLC ("Paradigm"); these debts are imputed to Ronald Wade Jaques ("Debtor");[2] and these debts are nondischargeable under § 523(a)(2), (4), and/or (6).[3]  Plaintiffs contend Debtor, who is the managing member of Paradigm, misused and converted funds held in trust on behalf of Plaintiffs.  Debtor contends he, as a member of Paradigm, is an individual distinct from Paradigm, and he is not liable for the debts of Paradigm.  A trial was held in November 2019, and the parties submitted written closing briefs in December.  The parties' closing briefs narrow the claims for relief to determinations of nondischargeability under § 523(a)(2)(A) and (a)(4).[4]

---

[1] All Plaintiffs, except Silver Fox Management LLC, filed proofs of claim in the main bankruptcy case.  No objections were made to those proofs of claim.

[2] Debtor formed Paradigm in 2011 with his business partner Chad Clark ("Clark").  Ex. 1001-16. Exhibits 1001 and 1002 are the transcripts of Debtor's deposition.  These exhibits were admitted by the parties' pre-trial stipulation without any reservation as to their use.  Doc. No. 35.  Exhibits 1001 and 1002 have been considered in addition to Debtor's testimony at trial.  *Cf. Cadleway Properties, Inc. v. Armstrong (In re Armstrong)*, 2006 WL 2850527, *1 n.5 (Bankr. D. Idaho Oct. 3, 2006) (considering the deposition testimony of certain witnesses admitted by agreement but noting there is no ability for the Court to evaluate credibility of testimony provided through deposition).

[3] Unless otherwise indicated, all statutory citations are to the Bankruptcy Code, Title 11 U.S.C. §§ 101–1532, Rule citations are to the Federal Rules of Bankruptcy Procedure, and Civil Rule citations are to the Federal Rules of Civil Procedure.

[4] As the parties have narrowed the issues, the Court will not reach claims alleged under § 523(a)(2)(B) and (a)(6).

This Court has jurisdiction pursuant to 28 U.S.C. § 1334, and all issues before it

are core matters on which it may enter final decisions under 28 U.S.C. § 157.  After

considering the evidence and the parties' closing arguments,[5] and taking judicial notice of

the Court's files,[6] this Court enters the following findings of fact and conclusions of law.

## II.    FACTS

### A.    Background

#### 1.    The parties

Debtor is a graduate of Utah State University with a degree in finance and

accounting.  He is a member of the National Association of Real Property Managers and

has attended that entity's conferences and trainings.  Debtor testified that he has a

working knowledge of QuickBooks and has been trained in the use of property

management software called AppFolio, from which Paradigm generated financial

information for itself and its property owner customers.  Debtor was a member of two

property management companies, Rentmaster of Rexburg, LLC ("Rentmaster"), and

Paradigm.[7]  Debtor currently works as a temporary employee for Blue Cross of Idaho.

Plaintiffs are property owners of apartment complexes and other multifamily

buildings managed by Paradigm until June 2018.  Eric Uhlenhoff ("Uhlenhoff") provided

---

[5] Plaintiffs' closing brief occasionally cites to exhibits and factual allegations not established though trial testimony or admitted evidence.  The Court has not considered this information in reaching the conclusions herein.

[6] *See, e.g., Jordan v. Kroneberger (In re Jordan)*, 392 B.R. 53, 62 n.16 (Bankr. D. Idaho 2008).

[7] Both Rentmaster and Paradigm are debtors in separate chapter 7 bankruptcy proceedings. *Paradigm Property Solutions, LLC*, No. 18-00850-JMM (Bankr. D. Idaho Jun. 29, 2018); *Rentmaster of Rexburg, LLC*, No. 18-00851-TLM (Bankr. D. Idaho Jun. 29, 2018).

testimony on behalf of T Street LLC, Doheny LLC, Trestles LLC, Oaklands LLC, EJC LLC, and EUDA LLC (collectively the "Uhlenhoff Entities").  Tammara Heron testified in her capacity as the trustee of the Heron Family Trust ("Heron Trust"), and her brother, Brett Heron, provided additional testimony regarding the relationship between the Heron Trust, Paradigm, and Debtor.  Matthew Wilson ("Wilson") is a member of Silver Fox Management, LLC ("Silver Fox"), and provided testimony on behalf of Silver Fox. Generally, Plaintiffs allege that Paradigm, in the process of managing their properties, obtained and held their "owner reserves," [8] tenant rents, and security deposits in trust. Plaintiffs allege that Debtor put their monies to unauthorized uses, gave them false assurances that their money was safe, and ultimately failed to return and account for their funds.

### 2.      Paradigm's banks accounts

Paradigm held two trust accounts—one commingled trust account for Paradigm's property owners (the "Paradigm Trust Account") and one trust account for Legacy Management Group, LLC ("Legacy"),[9] with subaccounts for each of Legacy's property owners.  Security deposits, Plaintiffs' tenants' rent payments, and owner reserves were comingled in the Paradigm Trust Account.  Paradigm also had an operating account, separate from the two trust accounts, from which its operating expenses and ownership

---

[8] An "owner reserve" is a fund used for expenses when income from rents will not be received in time or are otherwise insufficient to meet the current obligations of the property owner (*i.e.*, mortgage payments, utilities, property insurance, maintenance, or property taxes).  An owner will generally keep owner reserves at a certain level.  For example, the Heron Trust kept its owner reserve at $50,000, while many of the Uhlenhoff entities kept a $500 owner reserve for each property.

[9] Paradigm acquired Legacy, another property management company, in 2013.  Ex. 1001-17.

MEMORANDUM OF DECISION - 4

draws were taken.  The Paradigm Trust Account was initially at JPMorgan Chase Bank,
N.A. ("Chase"), in an account ending in 1762 (hereafter "Chase (1762)").  Exs. 1027 and
1057.  However, Paradigm's trust funds were moved to a Mountain America Credit
Union ("Mountain America") account ending in 3452-S50 (hereafter "Mountain America
(3452-S50)") in January 2018.[10]  Exs. 1001-30 and 1060-2.  Debtor was at all times in
charge of accounting and oversaw check writing and other transactions.

B.   **Chronology of events**

1.   **February 2015 – November 2015:  Trestles LLC, Doheny LLC,
and the Heron Trust contract with Paradigm**

In February 2015, Trestles LLC ("Trestles") acquired a sixteen-door[11] property
located at 8721, 8727, 8739, and 8743 Hackamore in Boise, Idaho.  *See* Ex. 1054 at 65,
69, 75, 81.  Paradigm had a contract with the previous owner of that property and had
started the leasing process.  After interviewing Debtor, Trestles kept Paradigm as the
property manager.  Despite Uhlenhoff's testimony that Trestles and Paradigm had a
written contract, no contract was produced at trial, and the terms of such contract remain
unknown.

On July 24, 2015,  Doheny LLC ("Doheny"), the owner of the Aspen Park
Apartments located at 505 E. Florida Ave. in Nampa, Idaho, entered into a "Full Service
Property Management Agreement" with Paradigm.  Ex. 1045 at 1, 5.  This agreement

---

[10] Though there are multiple bank accounts that held Plaintiffs' funds, the Court will refer to the
Paradigm Trust Account singularly, but it will identify, where pertinent, the specific bank account in
which the funds were held at any given time.

[11] In the context of property management, the term "door" means the number of rental units
comprising a property.  *See* Ex. 1002-23.

MEMORANDUM OF DECISION - 5

provided that Paradigm was to hold rents and security deposits in a "non-interest bearing trust account separate from [Paradigm's] personal or business operating accounts." *Id*. at 2. Paradigm was required to maintain accurate records of monies received and disbursed, and to provide those records—and a distribution—to Doheny on the twentieth of each month. *Id.* at 3. Paradigm was entitled to keep 5 percent of gross rents. *Id*. at 4. Though Paradigm was responsible for ensuring the proper management and maintenance of this twenty-four-door property, Paradigm was only entitled to reimbursement for maintenance costs in the event it advanced its own funds for maintenance. *Id.* at 3. Paradigm was not entitled to "mark up" the actually incurred maintenance expenses and collect the difference.[12] *See id.*

On November 24, 2015, The Heron Family Trust (the "Heron Trust"), owner of the Crossfield Apartments located at 980 W. Parkstone St. in Meridian, Idaho, entered into a "Multi-Family Property Management Agreement" with Paradigm. Ex. 1063 at 1, 5–6. This agreement included Paradigm's Standard Contract Terms. However, Paradigm was entitled to keep all tenant application fees, non-sufficient funds bank fees, move-out inspection fees, non-payment delivery notice fees, any other tenant related fees, and 4 percent of gross rents. *Id.* at 4–5. Paradigm was also entitled to a markup of 7 percent if Heron Trust requested Paradigm's assistance in renovation, modernization, or capital improvements (*i.e.*, HVAC work or floor replacement). *Id.* at 4. The agreement also

---

[12] In discussing future management contracts, the Court will reference these terms as "Paradigm's Standard Contract Terms," as they predominately are the terms of the contracts at issue. The Court will note where variations exist (*i.e.*, the percentage of gross rents Paradigm was entitled to keep or the allowance of maintenance expense markups).

required the Heron Trust to provide a minimum owner reserve of $40,000. *Id.* Tammara Heron testified that the Heron Trust maintained an owner reserve of $50,000.

The agreement further provided that the Heron Trust was "responsible for the payment of all mortgage/notes, property taxes, special assessments, Homeowner Association fees, special assessments [*sic*], all utilities, and premiums for casualty and liability insurance relating to the [Heron Property] unless otherwise modified in writing with [Paradigm]." *Id.* at 1, ¶ 3.5. The contract also stated that Paradigm "agrees to keep all mortgages, property taxes, association fees, or any other obligations which could lead to foreclosure action against the property current and paid in full." *Id.* at 2, ¶ 3.11. In addition, Tammara Heron testified there was an understanding with Debtor that Paradigm was to pay property insurance premiums on behalf of the Heron Trust. The evidence supports a finding that Debtor agreed to this arrangement. *See* Exs. 1087, 1081, and 1093. Paradigm was authorized to institute legal action to enforce lease terms, collect rents, or evict tenants, and could contract on the Heron Trust's behalf for lease enforcement. *Id.* at 2–3.

## 2.    January 2016:  the Heron Trust experiences early issues with Paradigm's services

In January 2016, the Heron Trust received a notice of delinquent property taxes. Ex. 1067-1. Robert Heron emailed Debtor to inquire about the issue. Debtor replied: "It is taken care of and it is a mistake and did not cost you! The payment was made on time and I have been working through it with them. It shows up as paid now and they are working to take it off completely." Ex. 1067-1. The Heron Trust also had some issues

MEMORANDUM OF DECISION - 7

with delinquent utility bills in January.  When the Heron Trust inquired about them, Debtor replied via email that it was "just checks passing in the mail."  Ex. 1096.

### 3.  June 2016 – August 2016:  Debtor is treated for a "subacute stroke"

On June 27, 2016, Debtor was treated at Idaho Neurology, Saint Alphonsus, by Mary E. River, MD, following a "subacute stroke."  Ex. 201-1.  Debtor had follow-up visits with the doctor.  There was no expert medical testimony to further explain the subacute stroke diagnosis or the implications thereof.  Debtor reported that he (1) was limited in what he could perform due to headaches, (2) had issues with memory and multitasking, and (3) had other stroke-related symptoms fatigue, disorientation, and difficulty in strategizing, thinking ahead, and seeing the bigger picture.  *See generally id.* at 8, 9, 11, 14–16.  Debtor did not inform Plaintiffs of the health issues that might affect his ability to operate Paradigm's business operations and resumed full operation of Paradigm later that year.

### 4.  November 2016: T Street LLC contracts with Paradigm

On November 22, 2016, T Street LLC ("T Street"), the owner of a twenty-two-door property located at 801 NW 2nd St. in Meridian, Idaho, entered into a "Full Service Property Management Agreement" with Paradigm.  Ex. 1041 at 1, 5.  This agreement included Paradigm's Standard Contract Terms without variation.  Subsequently, T Street added more doors to its property management arrangement with Paradigm.  The new property was located at 3606 W Rose Hill St. in Boise, Idaho.  Ex. 1054 at 55.  Based on

Uhlenhoff's testimony the new T Street properties were placed and treated under the original contract executed between Paradigm and T Street.

### 5. March 2017 – July 2017: change in Paradigm's ownership and the use of Merchant Cash Advances

In March 2017, Debtor sought to buy out one of his business partners, Chad Clark.[13]  To aid in that effort, Debtor hired Dallas Millington, CPA ("Millington"), to perform a valuation of Paradigm.  Ex. 1001 at 75.  Millington valued Paradigm at $320,871.68.  Ex. 1015-1.  Debtor testified that he bought Clark's interest in Paradigm for $125,000.

On May 31, 2017, Paradigm and Debtor, as an individual obligor, executed a promissory note by which an interest in Paradigm was transferred from Team One Investments, LLC ("Team One"), to Debtor.  That note provides:

> In exchange for Team One Investments, LLC's ownership and membership interest in Paradigm Property Solutions LLC [], Ronald Wade Jaques and Paradigm Property Solutions LLC promises to pay to the order of Team One Investments, LLC, ONE HUNDRED TWENTY-FIVE THOUSAND AND NO [sic] DOLLARS ($125,000.00) with ten percent interest (10%), payable beginning on May 31, 2017 and amortized over fifteen years and continuing until paid in full and this note shall be then be [sic] fully discharged[].
>
> . . .

---

[13] In 2013, Paradigm had four members—Clark, Doug Holladay ("Holladay"), Mike Edgar ("Edgar"), and Debtor.  Ex. 1001 at 50–51.  Debtor testified that each of the four owned 25%.  Id. at 51.  Edgar's interest in Paradigm was bought out sometime between 2013 and 2016.  Id. at 59–60, 69.  Holladay was a silent partner.  Id. at 60.  It is not apparent from the record whether Holladay's interest was ever bought out, and as discussed in the text immediately infra, Holladay signed a promissory note in May 2017 reflecting he was a member of Team One Investments, LLC, and that entity was an owner and member of Paradigm.  There was testimony that Holladay did participate in meetings, claiming to be an owner of Paradigm, on June 6 and 7, 2018.  Debtor testified in his deposition that he instructed Holladay to contact Plaintiffs for these meetings.  Ex. 1001-42.  Uhlenhoff testified that he believed Holladay had authority to grant Uhlenhoff access to AppFolio at this meeting.  For the purposes of this Decision, the exact makeup of the membership interests in Paradigm is not critical.

MEMORANDUM OF DECISION - 9

> Team One Investments, LLC [], agrees that with the execution of the above
> Promissory Note, that Team One transfers all of its ownership and
> membership and interest to Ronald Wade Jaques.

Ex. 1023-1.  Holladay signed this promissory note as a member of Team One

Investments, LLC.  Debtor testified that this note was executed in order to obtain funding

to buy out Clark.  However, by its terms, it obligates Debtor and Paradigm to *pay* Team

One, not obtain funds by which Debtor and Paradigm could pay Clark.  In addition, it is

not clear what interest Team One Investments held and relinquished upon execution of

the note.  Further, there is no indication, other than conflicting testimony by Debtor, that

any funds were disbursed in relation to this note.

Notwithstanding the Team One note as a purported source of funding, Debtor

testified that he found it necessary to enter into a series of Merchant Cash Advances

("MCA") in order to finance his acquisition of Clark's interest in Paradigm.

On June 28, 2017, Paradigm (and Rentmaster)[14] entered into an MCA agreement

with Fora Financial Business Loans, LLC, and Debtor executed this agreement.  Ex.

1018.  Fora Financial advanced $196,000, and *Rentmaster* was obligated to pay

$1,534.89 every business day through automatic direct payments until a total of $264,000

was repaid.[15]  *Id.* at 1–2.  Though the agreement named both Paradigm and Rentmaster,

---

[14] Debtor testified that he was advised by a "loan broker" to obligate Rentmaster's assets in
underwriting the MCAs because Rentmaster had been in business longer than Paradigm and the "loan
broker" considered Rentmaster to be a stronger business than Paradigm.  Though Clark had no interest in
Rentmaster, Debtor apparently obligated Rentmaster's assets to help Debtor and Paradigm buy out
Clark's interest in Paradigm.

[15] An MCA is not an ordinary loan.  The United States District Court for the Southern District of
New York explained in *Zyppah, Inc. v. Ace Funding Source, LLC*, 2019 WL 6647912 (S.D.N.Y. Nov. 6,
2019):

(Continued)

MEMORANDUM OF DECISION - 10

the only bank account listed in the "Authorization Agreement for Direct Deposit (ACH Credits) and Direct Payments (ACH Debits)" was Beehive Federal Credit Union, *id.* at 1, which was a bank used by Rentmaster, *see* Exs. 1028–1029.

Less than a month later, on August 15, 2017, Paradigm, through Debtor, entered into an MCA agreement with 1 Global Capital LLC ("Global"). Ex. 1020-1. Global advanced $90,000 in exchange for $125,100 of Paradigm's future "receipts."[16] *Id.* Paradigm was to pay Global $496.43 per business day through automatic clearing house ("ACH") debits. *Id.* In relation to this MCA agreement, Debtor executed an ACH

---

If a business wants fast access to cash, it may enter into a merchant cash advance agreement. Under such an agreement, a merchant cash advance provider gives the business a lump sum. In return, the business will pay a higher sum to the provider in installments, based on a percentage of the business' future sales.

*Id.* at *1. Generally, the installments are a percentage of each credit card transaction, as explained by the United States District Court for the Southern District of California in *Captain Bounce, Inc. v. Bus. Fin. Servs., Inc.*, 2012 WL 928412 (S.D. Cal. Mar. 19, 2012):

In such transactions, a financing company . . . advances a sum of money to a business in exchange for the assignment of a set amount of that business' future credit card receivables. The business directs its credit card processing company to remit to [the financing company] a set percentage of each payment the processor receives from a credit card issuer, referred to as the "Settlement Percentage." Thus, if the Settlement Percentage is 10%, the credit card processor will remit 10% of each credit card payment to [the financing company] before paying out 90% to the business (less the processor's fees). This process will continue until [the financing company] has received the total assigned value of credit card receivables.

*Id.* at *1 (internal citations omitted).

In this case, however, the MCAs were structured such that the installments would be a fixed amount in lieu of a daily percentage of credit card transactions because Paradigm was not a business that had daily credit card sales. These daily instalments were automatically drawn from accounts Debtor specified. *See generally* Exs. 1017–1022.

[16] In this MCA, and in all future MCAs, "receipts" included "accounts, contract rights, and other obligations arising from or relating to payments of monies from [Paradigm's] customers or third party payers." Ex. 1020-1.

MEMORANDUM OF DECISION - 11

authorization listing the Paradigm Trust Account, Chase (1762).  Ex. 1020-10.  Daily

ACH debts of $496.93 were drawn from this trust account.  *Id.* at 6–7; Ex. 1057 at 6–7.

### 6.      **August 2017:  Silver Fox engages Paradigm to manage properties**

In August 2017, Silver Fox acquired properties with twenty-doors located at 551

and 639 N. Moffat Ave. in Emmett, Idaho.  *See* Ex. 1108-1.  These properties were

already managed by Paradigm for Silver Fox's predecessor in interest, and Silver Fox

continued to use Paradigm as the property management company.  Silver Fox and

Paradigm never executed a final, written contract, and Plaintiffs failed to establish that a

contract otherwise existed.  Debtor did not inform Silver Fox that Paradigm was

significantly indebted under multiple MCAs.[17]

### 7.      **August 29, 2017 – September 2017:  Paradigm obtains more MCAs**

On August 29, 2017, Paradigm, through Debtor, entered into an MCA agreement

with Yellowstone Capital LLC ("Yellowstone").  Ex. 1017-16.  Yellowstone advanced

$82,500 in exchange for $115,418 of Paradigm's future "receipts."  *Id.*  Paradigm was to

pay Yellowstone $1,539 per business day.  *Id.* at 24.  Debtor testified that he authorized

Yellowstone to draw from Paradigm's operating account.[18]  However, the daily ACH

debits of $1,539 were drawn from the Paradigm Trust Account, Chase (1762).  Ex. 1057

at 6–7.

---

[17] The two prior MCAs obligated Paradigm and Rentmaster to pay a total of $389,100 ($264,000 + $125,100) through daily payments totaling $2,031.82 ($1,534.89 + $496.93).

[18] The ACH authorization related to this MCA did not list account information.  *Id.* at 23–25

MEMORANDUM OF DECISION - 12

In August 2017, the account records for the Paradigm Trust Account at Chase (1762) show that ACH payments to Global from the Paradigm Trust Account at Chase (1762) totaled $4,224.87. *Id.* at 6–7. In addition to Debtor's acts in regards to the MCAs, funds were drawn from the Paradigm Trust Account for other unauthorized reasons or purposes. In August 2017, the account records for the Paradigm Trust Account at Chase (1762) show multiple debit card transactions at locations where purchases could not conceivably have been related to the properties or otherwise authorized by the property owners to come out of the trust account. Ex. 1027 at 10–11, 12–15. These transactions include purchases at Dicks Sporting Goods, Les Schwab Tires, AutoZone, car washes, and restaurants.[19] *Id.*

On September 11, 2017, Rentmaster, through Debtor, entered into an MCA agreement with Arcarius, LLC. Ex. 1019-1. Arcarius advanced $200,000 in exchange for $296,000 of Rentmaster's future "receipts" to be paid every business day in the amount of $1,494.95 from Rentmaster's account at Beehive Federal Credit Union. *Id.* at 1–2. Though this agreement did not name Paradigm, Debtor testified that this agreement was also entered into to facilitate and fund the buyout of Clark's interest in Paradigm.

---

[19] The account records for Chase (1762) show that Debtor, Jason Hall (Paradigm's general manager), and Kimberly Jaques (Debtor's then-wife), had debit cards that were attached to the Paradigm Trust Account. In addition, Steve Rhodemhel and John Bertoni—individuals not otherwise identified or connected to Paradigm by the parties—are listed as holders of debit cards on this account. *Id.* at 16. Without further evidence, there is no way to ascertain with certainty who made which purchases.

### 8.    October 18, 2017:  Oaklands LLC, EJC LLC, and EUDA LLC contract with Paradigm

On October 18, 2017, Paradigm entered into property management agreements with three more Uhlenhoff entities: Oaklands LLC ("Oaklands"), the owner of a duplex located at 854 & 856 White Cloud in Boise, Idaho, Ex. 1042; EJC LLC ("EJC"), the owner of a seven-door property located at 543–549 W. Idaho St. in Meridian, Idaho,  Ex. 1043, and a one-door property located at 511 W. Pine in Meridian, Idaho, Ex. 1044; and EUDA LLC ("EUDA"), the owner of a four-plex (four doors) located at 662 W. Idaho St. in Meridian, Idaho, Ex. 1046.  These contracts included Paradigm's Standard Contract Terms. *See generally* Exs. 1042–1044, 1046.  However, Paradigm could mark up maintenance expenses by up to 20 percent.  Exs. 1042-3, 1043-3, 1044-3, and 1046-3.  Debtor did not inform Uhlenhoff that Paradigm was significantly indebted under multiple MCAs.[20]

### 9.    October 25, 2017 – November 2017:  Paradigm obtains more MCAs

On October 25, 2017, Paradigm and Rentmaster, through Debtor, entered into an MCA agreement with Ace Funding Source, LLC ("Ace Funding").  Ex. 1021-1.  Ace advanced $75,000, *see* Ex. 1057-3, in exchange for $112,425 of future "receipts" to be paid every business day in the amount of $1,874 from Rentmaster's account at Beehive Federal Credit Union, Ex. 1021 at 1, 5.  However, on October 31, 2018, an ACH payment

---

[20] The MCAs to this point obligated Paradigm and Rentmaster to pay a total of $800,518 ($264,000 + $125,100 + $115,418 + $296,000) through daily payments totaling $5,065.77 ($1,534.89 + $496.93 + $1,539 + $1,494.95).

of $1,874 to Ace Funding Source was made from the Paradigm Trust Account, Chase

(1762). Ex. 1057-7.

The account records for the Paradigm Trust Account, Chase (1762), show ACH

payments to Global, Yellowstone, and Ace Funding in October 2017 totaled $46,157.03.

Ex. 1057 at 6–7. In addition to these ACH payments, these account records show

multiple debit card transactions at locations where purchases could not conceivably have

been authorized by the owners to come out of the trust account. *Id.* at 11. These

transactions include purchases at Napa Auto Parts, car washes, and restaurants. *Id.* at 11–

15.[21]

On November 8, 2017, Paradigm, through Debtor, entered into another MCA

agreement with Yellowstone. Ex. 1017-1. Debtor testified that this second Yellowstone

MCA refinanced the first Yellowstone MCA which had a remaining balance of $56,936.

Ex. 1017-10. Yellowstone advanced an additional $33,064 ($90,000 - $56,936 balance)

in exchange for $131,310 of Paradigm's future "receipts." *Id.* Paradigm was then

obligated to pay Yellowstone $1,751 per business day. *Id.* at 9. Though this agreement

did not list a bank account from which Yellowstone was authorized to draw daily ACH

---

[21] At this time, Kimberly Jaques had been removed as a debit card holder on the Paradigm Trust
Account, but Leela Fryer was added and Debtor, Hall, Rhodemhel, and Bertoni still had debit cards.
Again, without further evidence, there is no way to ascertain with certainty which debit card holder made
which purchases. Ex. 1057 at 11–12, 16.

payments, Debtor testified that he authorized Yellowstone to draw from Paradigm's

operating account.[22]

### 10. November 20, 2017: The Uhlenhoff Entities begin having problems with Paradigm's services

Uhlenhoff was generally satisfied with Paradigm's services until the fall of 2017.

In November 2017, Doheny's $10,768.54 owner distribution check bounced.  On

November 20, 2017, Uhlenhoff emailed Debtor to inform him of the issue.  Ex. 1061-1.

Debtor responded:

> Eric, i [*sic*] got a call from chase [*sic*] on Friday about that check.  I am not
> sure what their issue was.  I will stop at chase [*sic*] as soon as they open and
> redeposit your check immediately after.  I am not sure what the problem was
> [*sic*] something about duplicate check numbers.

*Id.*  Indeed the record reflects, a check from "Paradigm Trust" at Chase for $10,768.54

was deposited on November 16 but was returned as unpaid on November 20.  *Id.* at 3–4.

A subsequent check from "Paradigm/Legacy" at Mountain West Bank in an amount of

$10,780.54 was deposited on November 21.  *Id.* at 4.[23]  Uhlenhoff believed Debtor's

representation that the issue had to do with duplicate check numbers.

Uhlenhoff had also noticed that the beginning and ending balances on his entities'

monthly owner statements were not matching up because Debtor was backdating

expenses to prior months.  Debtor acknowledged the mistakes made on the owner

statements and said he would attempt to fix the issue.  Uhlenhoff questioned Debtor on

---

[22] Payments on the previous Yellowstone MCA came out of the Paradigm Trust Account, Chase (1762), but it is not clear whether payments on this second Yellowstone MCA were also drawn on the Paradigm Trust Account.

[23] There was no explanation regarding the difference in amount between the two checks.

MEMORANDUM OF DECISION - 16

the integrity of his entities' security deposits, and Debtor represented the deposits were safe and intact. Uhlenhoff did not provide dates relating to his discovery of these accounting issues or his discussions with Debtor regarding the same.

### 11. December 2017: another MCA

On December 28, 2017, Rentmaster, through Debtor, entered into an MCA agreement with New Era Lending, LLC ("New Era"). Ex. 1022-1. New Era advanced $80,000 in exchange for $119,920 of future "receipts" to be paid every business day in the amount of $1,999 from Rentmaster's account at Beehive Federal Credit Union. *Id.* at 1, 7. Though this agreement did not name Paradigm, Debtor testified that this agreement was also entered into to buy out Clark.[24]

### 12. Early January 2018: Paradigm fails to make the Heron Trust's insurance premium payment

In early January 2018, the Heron Trust received a notice of insurance cancellation for non-payment of a December 2017 premium. Exs. 1083-1 and 1084. Debtor knew Paradigm was obligated to pay the insurance premium.[25] Paradigm paid the $3,148

---

[24] In total, Debtor received approximately $756,564 from the various MCAs (all purportedly acquired in order to pay Clark $125,000 for his interest in Paradigm), obligating Paradigm and Rentmaster to pay a total of $1,048,755 ($264,000 + $125,100 + $296,000 + $112,425 + $131,310 + $119,920) through daily payments totaling $9,150.77 ($1,534.89 + $496.93 + $1,494.95 + $1,874 + $1,751 + $1,999). As of the end of June 2018 when Paradigm filed its bankruptcy petition, the various MCA creditors were listed as being owed $524,787.

[25] Paradigm had previously reimbursed the Heron Trust for a $21,607.58 insurance premium payment in October 2016. Ex. 1082. This, along with Paradigm's subsequent payment of this December premium, evidences Paradigm's (and Debtor's) appreciation of, and agreement to, an arrangement where Paradigm was responsible to timely pay the Heron Trust's property insurance premiums out of the Paradigm Trust Account.

MEMORANDUM OF DECISION - 17

premium on January 9, 2018.  Exs. 1086-3, 1094-2, and 1095-1.  The notice of

cancellation was rescinded on January 11, 2018.  Ex. 1085-1.

### 13.      January 23, 2018:  Debtor obtains a personal loan

On January 23, 2018, Debtor obtained a personal loan for $80,000 from his

parents.  Ex. 1024.  Debtor testified that this loan was to help with Paradigm's cash flow.

Debtor and Kimberly Jaques personally signed a promissory note for this loan.  Debtor

did not sign this note on behalf of Paradigm or Rentmaster.  *Id*.  Debtor testified that he

deposited the funds from this loan into either the Paradigm or Rentmaster accounts, but

he did not specify which account(s).

### 14.      Paradigm fires Wendy Lawrence

Around February 2018, Debtor instructed Wendy Lawrence, Paradigm's

bookkeeper, to make a $22,000 adjustment to an owner statement.  Lawrence refused to

make the adjustment because the ending balance on the previous owner statement would

not match the beginning balance on the next.  Her employment at Paradigm was

subsequently terminated.  She believes, and the Court finds, she was terminated because

she refused to make this adjustment.

### 15.      February 2018 – June 2018:  Plaintiffs experience increasingly significant problems with Paradigm and Debtor

#### a.      February 2018

In February 2018, the Heron Trust received notice that the December 2017

property taxes had not been paid.  Ex. 1070.  A prior owner statement issued by Paradigm

showed this property tax payment had been made on time.  Ex. 1069-9.  When the

Herons emailed Debtor to figure out what had happened to the tax check purportedly

MEMORANDUM OF DECISION - 18

written on November 30, 2017, Debtor replied: "I will go down and clear it all up with them on Tuesday.  It did clear."  Ex. 1071-1.

On February 6, 2018, Cincinnati Insurance Companies billed the Heron Trust $3,148.00 to be paid by February 30, 2017, with an additional $6,286.00 due in two installment payments by July 30, 2018.  Ex. 1086 at 1–2.  On February 12, 2018, Tammara Heron emailed Debtor and requested he pay the total balance of $9,434.00.  Ex. 1086-2.  Debtor agreed to do so.  Ex. 1087-1.

### b.      March 2018 – May 1, 2018

In March 2018, Uhlenhoff was told by a vendor, System Kleen, that the vendor planned to place a lien on one of the Uhlenhoff Entities' properties for unpaid work the vendor performed in November 2017.  The entity's owner statement showed the vendor as having been paid.  Uhlenhoff met with Debtor, who claimed that System Kleen had horrible books and Paradigm had already paid for the services.  Uhlenhoff again asked Debtor about his entities' security deposits, and Debtor represented that the deposits were safe in the Paradigm Trust Account.

The Heron Trust's March 2018 owner statement listed an owner distribution of $42,341.26, but that distribution had not been made.  Ex. 1066-5.  When Tammara Heron confronted Debtor about the reported distribution check, he claimed there was an issue with the bank account numbers being transposed, and he was going to the bank to fix the issue.  The Heron Trust never received this distribution.

In March 2018, the Heron Trust received another insurance termination notice based on a failure to pay the February insurance premiums.  Ex. 1088.  Tammara Heron

again brought the matter to Debtor's attention, and Debtor claimed he had paid the balance in full, as they agreed he would the previous month, and provided a confirmation number. Ex. 1089. Tammara Heron testified that the confirmation number was fabricated, but the April insurance invoice showed a payment was made on March 12, 2018. Ex. 1091-2. The notice of termination was rescinded March 14, 2018. Ex. 1090. On May 1, 2018, Paradigm tendered two additional checks for $3,148.00 each to the insurance provider. Ex. 1093-1.

From the initiation of their arrangement in August 2017, Silver Fox agreed to forego the receipt of owner distributions until accounting issues were resolved.[26] However, Wilson became more concerned in March 2018 because Silver Fox was still not receiving accurate financial statements. In April 2018, Silver Fox demanded the balance of owner distributions then owed. Debtor assured Wilson that Silver Fox's money was fine and he would wire the money over immediately, but Silver Fox never received its funds.

### c.    May 2018 – June 2018

On May 29, 2018, Uhlenhoff received a call from another vendor, a painter named Craig O'Neal, who complained that he was not paid for work completed in the summer of 2017. Uhlenhoff personally paid Craig O'Neal. Uhlenhoff met with Debtor on May 31,

---

[26] Debtor told Wilson that Paradigm's books were incorrect because one of Paradigm's bookkeepers, Wendy Lawrence, had made mistakes. Debtor said that he fired this bookkeeper and was attempting to fix the mistakes. While it appears the $22,000 adjustment Lawrence claims to have been fired over, *see* § II.B.14 *supra*, could be related to Silver Fox's owner statements, there is not enough evidence to make such a finding.

2018, and demanded that Debtor put someone else in charge of the day-to-day operations of Paradigm.  He did not immediately fire Paradigm because he was worried about incoming rent checks.  Debtor agreed to put Jason Hall, Paradigm's general manager, in charge, not disclosing to Uhlenhoff that Hall had already resigned.[27]  Uhlenhoff fired Paradigm, shortly thereafter, in a face-to-face meeting with Debtor on June 5, 2017.

In May 2018, The Heron Trust received a second delinquency notice which showed the December 2017 property tax payment was still delinquent in the amount of $65,491.20 with late fees of $1,215.79 and interest of $3,485.91.  Ex. 1072.  On June 4, 2018, Tammara Heron and her brother, Brett Heron, met with Debtor at his office, to collect the June 2018 property tax payment which they planned on delivering to the Ada County Assessor's office themselves.  Debtor handed them a receipt dated June 1, 2018, showing a payment of $60,789.50, the original amount owing.  Ex. 1073.  Clearly noticeable are two alterations in the "Late Charge" and "Interest" columns where this receipt lists those fees as $0.00.  *Id.*  Debtor also gave them a blurry image of a cancelled check which he claimed to have printed from the account records at Chase.[28]  Ex. 1074. This document included a description of the check with a check number of 678, post date of 12/06/2017, and an amount of $60,789.50.  *Id*.  Tammara Heron believed at the time these documents were accurate, but now believes they were forged.[29]  Debtor also gave

---

[27] Hall's last day at Paradigm was June 6, 2018, following a two-week notice of his resignation.

[28] At this point, Paradigm had its accounts at Mountain America, not Chase.

[29] Wendy Lawrence also testified that Debtor instructed her to backdate a check for property taxes for the Heron Trust property that had not been paid on time.

MEMORANDUM OF DECISION - 21

them a check from a Mountain America Credit Union account in the amount of

$60,789.50 to pay the property tax payment due in June 2018.  Ex. 1075.

When the Herons paid the Heron Trust's June 2018 property taxes, the Ada

County Assessor provided a receipt with the history of the tax payments from 2012 to

2017.  Ex. 1076.  The payment actually made for the December 2017 property taxes was

for $65,083.49 and that included a late charge of $1,215.79 and interest of $3,078.20.  *Id*.

at 1.[30]  The receipt also stated: "On 5/31/2018, a check (002004) payment of $65,083.49

was received from JAQUES RON."  *Id*. at 2.  That check was written from Debtor's

personal account at Mountain West Bank.  Ex. 1079.  Debtor testified that he paid this

from his personal account because he felt bad about the situation.

On June 4, 2018, Wilson met with Debtor in person to express his concerns over

Silver Fox's lack of owner distributions and the failure to provide owner statements.  In

this meeting, Debtor provided owner statements for 2017 and 2018, Exs. 1108 and 1109,

and again promised to make wire transfers of the balance owing.  Exhibit 1109 is Silver

Fox's owner statement for 2018.  It shows that Paradigm made an owner distribution of

$35,755.28.  Ex. 1109-4.  However, Wilson testified that Silver Fox never received this

alleged distribution.  There is also an ending cash balance of $3,310 that Silver Fox never

received.  Ex. 1109-4.

---

[30] In addition, the December 2015 payment also included a late charge of $1,011.80, *id.*, which is
something the Herons were unaware of before that time and contradicts Debtor's assurance that the 2015
tax issue did not cost the Heron Trust, Ex. 1067-1.

### 16.    June 7, 2018 meeting and subsequent events

On June 7, 2018, Tammara Heron, Brett Heron, Uhlenhoff, and Wilson met with Debtor and Holladay to discuss the several issues they were having with Paradigm's services.  At this meeting Debtor informed Plaintiffs that their money was gone because creditors had "swept" the Paradigm Trust Account.  Debtor also admitted he lied to Tammara Heron about the Heron Trust's $42,000 owner distribution problem being a bank issue, and to Uhlenhoff about the integrity of the security deposits.  Debtor provided a Mountain America (3452-S50) statement that showed a balance of $17,388.53 in the Paradigm Trust Account.  Ex. 1060-2.  Debtor testified that the trust account should have had around $300,000 as of June 7, 2018, but that these funds went to the MCA lenders.

On June 8, 2018, Sara Phillips, Paradigm's receptionist and leasing agent, helped Plaintiffs obtain further financial records from AppFolio.[31]  On June 11, 2018, Tammara Heron mailed a letter to Debtor terminating Paradigm's services and hand delivered three copies of the termination letter to Paradigm's office.

### 17.    Plaintiffs obtain a temporary restraining order in state court

On June 11, 2018, Plaintiffs sued Debtor, Paradigm, and Rentmaster in the District Court of the Fourth Judicial District of the State of Idaho, Case No. CV01-18-10654. Ex. 1040-7.  Plaintiffs contemporaneously applied for a temporary restraining order.  *Id*. at 22.  On June 14, 2018, District Judge Steven Hippler issued an "Amended Ex Parte

---

[31] Phillips had access to Paradigm's AppFolio account, from which she could generate reports and access other financial information by property owner.

Temporary Restraining Order" ("State TRO").  *Id.* at 34.  The State TRO was to expire

on June 28, 2018, and it provided:

> IT IS THEREFORE ORDERED that Defendants, and their officers, agents, servants, employees, attorneys, and all other persons in active concert or participation with any of them . . . are hereby temporarily restrained and enjoined from:
>
>> A. Except as required in the ordinary course of business or, in the case of individuals subject to this Order, for necessary and ordinary living expenses, [t]ransferring, liquidating, converting, encumbering, pledging, loaning, selling, concealing, dissipating, disbursing, assigning, spending, withdrawing, granting a lien or security interest or other interest in, or otherwise disposing of any funds, real or personal property, accounts, contracts, shares of stock, lists of consumer names, or other assets, or any interest therein, wherever located, including outside the territorial United States, that are:
>>
>>> 1. Owned, controlled, or held by, in whole or in part, for the benefit of, or subject to access by, or belonging to, any Defendant;
>>>
>>> 2. In the actual or constructive possession of any Defendant; or
>>>
>>> 3. In the actual or constructive possession of, or owned, controlled, or held by, or subject to access by, or belonging to, any other corporation, partnership, trust, or any other entity directly or indirectly owned, managed, or controlled by, or under common control with, any Defendant . . .
>>
>> . . .
>>
>> C. Except in the ordinary course of business, cashing any checks or depositing or processing any payments from customers of Defendants.

*Id.* at 35–38.

MEMORANDUM OF DECISION - 24

### 18.     Debtor opens new bank accounts for Paradigm

In June 2018, Debtor opened new accounts for Paradigm at Zions Bank ("Zions") with account numbers ending in 4597 (hereafter "Zions (4597)") and 4589 (hereafter "Zions (4589)").[32]  Ex. 1002-7.  Debtor opened these accounts after the State TRO froze Paradigm's existing accounts.  Ex. 1002-13.  Despite the pending lawsuit, State TRO, and the Uhlenhoff Entities' and the Heron Trust's termination of Paradigm's services, Debtor deposited rent checks from Plaintiffs' tenants into these accounts.  *See generally* Exs. 1032, 1034.  Between June 20, 2018, and June 21, 2018, Debtor deposited $61,172.40 into Zions (4597), Ex. 1031-1, and $2,500 into Zions (4589), Ex. 1033-1.  On June 22, 2018, Debtor transferred $25,000 from Zions (4597) to Zions (4589).  Exs. 1033-1 and 1034 at 6–7.  Debtor then issued $6,774.99 in "final paycheck[s]" to his employees from these accounts—$2,953.86 from Zions (4589), Ex. 1034 at 11–12, and $3,821.13 from Zions (4597), Ex. 1035 at 1–2.

Debtor also withdrew money from these accounts and deposited the funds into his personal account, Zions (6564).  On June 20, 2018, Debtor withdrew $1,000 from Zions (4597), Ex. 1035-1, with a corresponding $1,000 deposit into his personal account, Ex. 1036-1.  On July 12, 2018,  Debtor withdrew $1,500 from Zions (4589), Ex. 1034-13, with a corresponding $1,500 deposit into his personal account, Ex. 1036-1.  On July 19, 2018, Debtor withdrew $558 from Zions (4589), Ex. 1034-14, with a corresponding $558 deposit into his personal account, Ex. 1036-5.

---

[32] Rentmaster also had an account at Zions ending in 7008, *see* Ex. 1030, and Debtor had a personal account at Zions ending in 6564 (hereafter "Zions (6564)"), *see* Ex. 1036.

On June 29, 2018, the balance in Zions (4597) was negative $397, improving to $0 by July 2, 2018.  Ex. 1031 at 1, 5.  On August 20, 2018, the balance in Zions (4589) was negative $844.79.  Ex. 1033-11.  On August 20, 2018, Debtor filed his chapter 7 bankruptcy petition.  *In re Jaques*, No. 18-01092-TLM (Bankr. D. Idaho).  Debtor did not initially disclose his personal account, Zions (6564), in his schedules, and he amended his schedules twice before listing this personal account.  *Id.* at Doc. Nos. 1 at 14, 69 at 6, and 147 at 3.

C.    **Summary of Plaintiffs' claims**

The Plaintiffs seek to establish nondischargeable debts under §§ 523(a)(2) or (4), asserting that Debtor misused and exhausted the funds entrusted to his company, Paradigm.  EUDA seeks $5,525 in damages, Doc. No. 53 at 30; EJC seeks $14,400, *Id.*; Doheny seeks $56,270.49,  *Id.* at 31; Oaklands seeks $3,150, *Id.*; T Street seeks $38,088.85, *Id.*; Trestles seeks $37,107.68, *Id.* at 31–32.; Tammara Heron, as trustee of the Heron Trust, seeks $270,667.31, *Id.* at 33; and Silver Fox seeks $49,690.84, *Id.*

III.   **DISCUSSION & DISPOSITION**

A.    **Debtor's personal liability**

1.    **Limited liability**

Debtor argues that he, as a member of Paradigm, is separate from Paradigm, and that he is therefore shielded from liability under the Idaho LLC statute, which provides:

(a)    A debt, obligation, or other liability of a limited liability company is solely the debt, obligation, or other liability of the company.  A member or manager is not personally liable, directly or indirectly, by way of contribution or otherwise, for a debt, obligation, or other liability of the company *solely by reason of being or acting as a*

*member or manager.* This subsection applies regardless of the dissolution of the company.

(b)  The failure of a limited liability company *to observe formalities relating to the exercise of its powers or management of its activities and affairs* is not a ground for imposing liability on a member or manager for a debt, obligation, or other liability of the company.

Idaho Code § 30-25-304 (emphasis added).[33]  Debtor's analysis, however, is incomplete. Plaintiffs, here, do not assert that Debtor's liability is solely due to his being a member of Paradigm.  Rather, they argue liability is based on Debtor's own fraudulent and improper conduct.

"Generally, '[m]embers of an LLC are not liable for the misconduct *of the company* unless it is proven that the company is the alter ego of the member or manager.'" *Drug Testing Compliance Grp., LLC v. DOT Compliance Serv.*, 383 P.3d 1263, 1276 (Idaho 2016) (emphasis added) (quoting *Wandering Trails, LLC v. Big Bite Excavation, Inc.* 329 P.3d 368, 376 (Idaho 2014), which equated the alter ego test to "piercing the corporate veil" in the context of the prior LLC statute) (considering a manager's liability under the current LLC statute).  The Idaho Supreme Court has not addressed whether the protections of Idaho Code § 30-25-304 extend to the individual misconduct of the member, *i.e.*, for conduct beyond being a member and/or failing to observe formalities in managing the LLC.

---

[33] In 2015, the Idaho Legislature repealed the Idaho Uniform Limited Liability Company Act, Chapter 6, Title 30, Idaho Code and replaced it with Chapter 25, Title 30, Idaho Code.  2015 Idaho Sess. Laws 243.  Though Paradigm was formed in 2011, the current Idaho LLC statute governs.  Idaho Code § 30-25-110(b) ("Except as otherwise provided in subsection (c) of this section, on and after July 1, 2017, this chapter governs all limited liability companies").

As noted in *In re Sterling Mining Co.*, 415 B.R. 762 (Bankr. D. Idaho 2009), if a state's highest court has not addressed an issue of law, this Court "must predict how the highest state court would decide the issue." *Id.* at 767 (quoting *In re First Alliance Mortgage Co.*, 471 F.3d 977, 993 (9th Cir.2006); and citing *Glendale Assocs., Ltd. v. NLRB*, 347 F.3d 1145, 1154 (9th Cir.2003) (directing a federal court to use intermediate appellate decisions, decisions from other jurisdictions, statutes, and secondary authorities as guidance to determine how the state court would rule)).  Thus, this Court must interpret the statutory language of Idaho Code 30-25-304 as the Idaho Supreme Court would.  When addressing statutory construction, the Idaho Supreme Court has stated:

> "The asserted purpose for enacting the legislation cannot modify its plain meaning.  The scope of the legislation can be broader than the primary purpose for enacting it." *Viking Constr., Inc. v. Hayden Lake [Irrigation] Dist.*, 149 Idaho 187, 191–92, 233 P.3d 118, 122–23 (2010).  "If the statute as written is socially or otherwise unsound, the power to correct it is legislative, not judicial." *In re Estate of Miller*, 143 Idaho 565, 567, 149 P.3d 840, 842 (2006).  The interpretation of a statute "must begin with the literal words of the statute; those words must be given their plain, usual, and ordinary meaning; and the statute must be construed as a whole.  If the statute is not ambiguous, this Court does not construe it, but simply follows the law as written." *State v. Schwartz*, 139 Idaho 360, 362, 79 P.3d 719, 721 (2003) (citations omitted).  "We have consistently held that where statutory language is unambiguous, legislative history and other extrinsic evidence should not be consulted for the purpose of altering the clearly expressed intent of the legislature." *City of Sun Valley v. Sun Valley Co.*, 123 Idaho 665, 667, 851 P.2d 961, 963 (1993).

*Verska v. Saint Alphonsus Reg'l Med. Ctr.*, 265 P.3d 502, 505–06 (Idaho 2011).

Idaho Code § 30-25-304 shields a member from liability of the company "solely by reason of being or acting as a member or manager" of the LLC and makes clear that the "failure to observe formalities" as the LLC exercises its powers or manages its affairs

is not a basis for imposing liability on a member.  However, neither of these protections

relates to, nor does the statute expressly limit liability of a member for, the member's

actions that are undertaken outside the normal performance of his or her duties.  Thus, the

scope of this limited liability does not extend to a member's actions when the member

causes the company to act illegally or fraudulently, or when the member is not acting

within the bounds of her duties or obligations as a member of the company, but in his or

her own self-interest.

The Official Comments to Idaho Code § 30-25-304 are particularly instructive on

this issue:[34]

> Because the member or manager liability at issue is solely vicarious, the
> shield is irrelevant to claims seeking to hold a member or manager directly
> liable on account of the member's or manager's own conduct.  Put another
> way, "[t]here is no question" that "the member-manager of a limited liability
> company who causes his business to breach common law and statutory duties
> may be held independently liable for his personal torts."  *Dep't of Agric. v.*
> *Appletree Mktg., L.L.C.*, 485 Mich. 1, 4, 18, 779 N.W.2d 237, 239, 247
> (2010).
>
> A few judges have failed to understand this point.  *See Puleo v. Topel*, 368
> Ill. App. 3d 63, 68–69, 856 N.E.2d 1152, 1157 (Ill. App. Ct. 2006) (basing
> its holding on a legislative amendment that "removed . . . language which
> explicitly provided that a member or manager of an LLC could be held
> personally liable for his or her own actions or for the actions of the LLC to
> the same extent as a shareholder or director of a corporation could be held
> personally liable").
>
> This mistaken view: (i) ignores the actual words of LLC shield provisions
> (which protect members and managers only against liability for obligations
> of an LLC and make no reference to direct obligations of a member or
> manager); and (ii) flouts public policy (which recoils from the idea of
> immunizing a person's misconduct solely because the person acts on behalf

---

[34] *See Jen-Rath Co. v. Kit Mfg. Co.*, 48 P.3d 659, 664 (2002) (considering official comments to
the Idaho Code as persuasive authority).

MEMORANDUM OF DECISION - 29

of an organization).    Moreover, the mistaken view is contrary to the overwhelming weight of the case law.  *See, e.g., Mbahaba v. Morgan*, 163 N.H. 561, 565, 44 A.3d 472, 476 (2012) ("When . . . a member or manager commits or participates in the commission of a tort, whether or not he acts on behalf of his LLC, he is liable to third persons injured thereby."); *Sturm v. Harb Dev., LLC*, 298 Conn. 124, 138, 2 A.3d 859, 870 (2010) (holding that the liability shield of an LLC is subject to "the common-law tort exception . . . [for] individual claims against LLC members"); *Allen v. Dackman*, 413 Md. 132, 154, 991 A.2d 1216, 1229 (2010) ("An LLC member is liable for torts he or she personally commits, inspires, or participates in because he or she personally committed a wrong, not 'solely' because he or she is a member of the LLC."); *Weber v. U.S. Sterling Sec., Inc.*, 282 Conn. 722, 732-34, 924 A.2d 816, 824–25 (2007) (stating that the Delaware LLC Act "does not preclude individual liability for members of a limited liability company if that liability is not based simply on the member's affiliation with the company" and holding, in particular, that the Act "does not bar the defendants' liability for tortious conduct").

This Court concludes that the Idaho Supreme Court would not extend the scope of the limited liability protection of Idaho Code § 30-25-304 beyond the protections expressly enumerated in the statute.  The plain meaning of the statute only protects a member for liabilities imposed "solely by reason of being or acting as a member or manager" or for "failure to observe formalities," and, as explained by the Official Comments to Idaho Code §§ 30-25-304, the "shield is irrelevant to claims seeking to hold a member or manager directly liable on account of the member's or manager's own conduct."  Therefore, Debtor is not shielded from liability for his own wrongful or tortious conduct.

### 2.    Paradigm was Debtor's alter ego

Where a limited liability company shields its member(s) from liability, and equitable considerations compel a court to disregard that shield, creditors may also "pierce the veil" of the LLC by establishing the LLC was the "alter ego" of its

MEMORANDUM OF DECISION - 30

member(s), and thereby impose personal liability on the otherwise protected member(s).

*Wandering Trails*, 329 P.3d at 376.[35] Here, Debtor argues Plaintiffs cannot pierce the

veil because they failed to raise the concept of veil piercing until their closing argument.

Doc. No. 54 at 11.

> Civil Rule 54(c), incorporated by Rule 7054(a), provides:

> A default judgment must not differ in kind from, or exceed in amount, what
> is demanded in the pleadings. *Every other final judgment should grant the
> relief to which each party is entitled, even if the party has not demanded that
> relief in its pleadings.*

(Emphasis added.)  The broad relief under Civil Rule 54(c) is limited "where the failure

to request appropriate relief prejudices the adversary's defense of the matter." *Hopkins v.*

*D.L. Evans Bank (In re Fox Bean Co.)*, 287 B.R. 270, 289 (Bankr. D. Idaho 2002) (citing

*Samayoa v. Jodoin* (*In re Jodoin*), 196 B.R. 845, 851–52 (Bankr. E.D. Cal.1996)).

However, as the *Jodoin* court explained:

> [P]rejudice refers to lack of opportunity to present additional evidence to
> meet the unpleaded issue.  Hence, prejudice has been found where
> forewarning would have led to additional evidence that was not otherwise
> relevant to the issues that were expressly raised in the pleadings. *Rivinius,
> Inc. v. Cross Mfg., Inc. (In re Rivinius, Inc.),* 977 F.2d 1171, 1177 (7th Cir.
> 1992).  But prejudice has not been found to exist when the additional
> evidence would also have been relevant to the issues that were expressly
> raised. *Rental Dev. Corp. v. Lavery,* 304 F.2d 839, 842 (9th Cir. 1962).

*Jodoin*, 196 B.R. at 852.

---

[35] Though *Wandering Trails*, 329 P.3d at 376, discusses the alter ego test in the context of the
prior LLC statute, the Idaho Supreme Court's decision in *Drug Testing Compliance*, considering personal
liability under the current LLC statute, suggests the alter ego test utilized in *Wandering Trails* remains
applicable under the current LLC statute. *See Drug Testing Compliance*, 383 P.3d at 1276 (citing
*Wandering Trails*, 329 P.3d at 376).

MEMORANDUM OF DECISION - 31

In this case, Debtor is not prejudiced by the Court's consideration of the issue of veil piercing. Veil piercing was an inherent issue in Plaintiffs' causes of action. Debtor demonstrated awareness of the issue by taking multiple opportunities to argue against veil piercing before and after the introduction of evidence. Absent from Debtor's arguments against piercing the veil, and not otherwise apparent to this Court, is any indication that additional evidence would have been presented at trial had Plaintiffs specifically raised this issue in their complaint or pretrial briefing. Thus, the fact that this issue was not raised in the complaint or argued by Plaintiffs in their pretrial brief does not prohibit the Court from considering the issue and granting consistent relief if Plaintiffs have carried their evidentiary burden to pierce the veil.

To establish that Paradigm was the alter ego of Debtor, Plaintiffs must prove "(1) a unity of interest and ownership to a degree that the separate personalities of the [company] and individual no longer exist and (2) if the acts are treated as acts of the [company] an inequitable result would follow." *Wandering Trails*, 329 P.3d at 376 (citing *VFP VC v. Dakota Co.,* 109 P.3d 714, 723 (Idaho 2005); *Vanderford Co. v. Knudson,* 165 P.3d 261, 270–71 (Idaho 2007)).

### a.     "Unity of Interest"

A unity of interest is not established merely because the individual is the only member of the LLC and exercises full control over said entity. *Wandering Trails*, 329 P.3d at 377. The Idaho Supreme Court held:

> Under the theory of piercing the corporate veil, factors to consider include the level of control that the shareholder exercises over the corporation, the lack of corporate formalities, the failure to operate corporations separately,

> keeping separate books, and the decision-making process of the entity. *See Surety Life Ins. Co. v. Rose Chapel Mortuary, Inc.,* 95 Idaho 599, 602, 514 P.2d 594, 597 (1973). However, Idaho's limited liability act specifically provides that "[t]he failure of a limited liability company to observe any particular formalities relating to the exercise of its powers or management of its activities is not a ground for imposing liability on the members or managers for the debts, obligations or other liabilities of the company." I.C. § 30-6-304(2).[36] *The question therefore, becomes whether there is sufficient evidence "such that there was no distinction between the personalities of" the [company and its members].* Hutchison v. Anderson,* 130 Idaho 936, 940, 950 P.2d 1275, 1279 (Ct. App. 1997).

*Id.* at 376–77 (emphasis added).

Factors relevant to establish a unity of interest include evidence that the debtor deposited his or her own money into the company's financial accounts for purposes other than meeting capital obligations;[37] that the debtor used company funds to pay her own obligations; and that the debtor failed to maintain the separate identity of the company. *See id.* The Idaho Supreme Court, in the context of piercing the corporate veil of a

---

[36] Again, the prior Idaho Uniform Limited Liability Company Act, Chapter 6, Title 30, Idaho Code was replaced by Chapter 25, Title 30, Idaho Code.

[37] The Idaho Supreme Court did not explain what it meant by "capital obligations." *See generally id.* The Idaho LLC statute does not define the term "capital obligation," but the Official Comments to Idaho Code § 30-25-102 refer to "capital contributions" when discussing the definition of "contribution" in Idaho Code § 30-25-102(a)(2)—"property or a benefit described in section 30-25-402, Idaho Code, that is provided by a person to a limited liability company to become a member or in the person's capacity as a member." The Official Comments to Idaho Code § 30-25-102 explain: "This definition serves to distinguish capital contributions from other circumstances under which a member or would-be member might provide benefits to a limited liability company (*e.g.*, providing services to the LLC as an employee or independent contractor, leasing property to the LLC)."

However, the ordinary meaning of the term "obligation" is "[a] legal or moral duty to do or not do something. . . . A formal, binding agreement or acknowledgement of a liability to pay a certain amount or do a certain thing for a particular set of persons; esp. a duty arising by contract." BLACK'S LAW DICTIONARY 1179 (9th ed. 2009). Thus, "capital obligation," as contemplated by the Idaho Supreme Court, was likely narrower than "capital contribution" as defined in Idaho Code § 30-25-102, and is, in the context of an LLC, a capital contribution which a member of an LLC is under a legal duty to make to become a member or as required by his membership in the LLC (*i.e.*, capital contributions required by the operating agreement or based on subsequent agreement between the members and/or the LLC).

MEMORANDUM OF DECISION - 33

corporation, explained that a trial court may consider a variety of factors and is not required to meet any set number of factors before piercing the veil. *Lunneborg v. My Fun Life*, 421 P.3d 187, 200 (Idaho 2018). *Lunneborg* addressed corporate veil piercing, not alter ego determinations involving an LLC. *See generally id.* However, the court's holding provided a general statement of the standards courts should apply "when making these equitable determinations." *Id.* Thus, as long as those standards do not contravene Idaho's limited liability act, discussed *supra* § III.A.1, those same standards should apply here.

In this case, there is ample evidence of a unity of interest between Debtor and Paradigm. The evidence establishes Debtor disregarded the separate identities of his businesses and himself. Debtor repeatedly obligated the assets of Rentmaster to obtain financing needed for the buyout of a Paradigm member. When the obligation to service the MCAs caused a need for cash flow, Debtor obtained a personal loan, not a business loan for and through Paradigm, from his parents and deposited that money into a company account, even though there is no indication Debtor was personally obligated to meet Paradigm's expenses. In addition, Debtor used his own funds to pay Plaintiff's obligations that should have been paid from the Paradigm Trust Account (*i.e.*, the payment of the Heron Trust's property taxes). In short, Debtor used whatever funds were or could be made available to meet immediate needs without regard to whether those funds belonged to Paradigm, Paradigm's clients, Rentmaster, or himself personally. The evidence of Debtor's conduct supports a determination that Debtor disregarded the

distinction between the personalities of Paradigm and himself, and establishes a unity of

interest between Paradigm and Debtor.

### b.    "Inequitable result"

The Idaho Supreme Court also addressed the "inequitable result" factor of the alter

ego test in *Lunneborg*.  In holding that the trial court did not abuse its discretion, the

Idaho Supreme Court stated:

> The court recognized that this factor "requires something less than an affirmative showing of fraud but something more than the mere prospect of an unsatisfied judgment." (citing *Wachovia Securities, LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 756 (7th Cir. 2012) ).  Applying this legal standard the court found that an inequitable result would occur beyond simply the prospect of an unsatisfied judgment.  As the court noted, this is because "[i]nstead of paying the severance to Lunneborg as provided in his employment contract, the Edwards drained MFL of all income and assets by diverting those assets and income to themselves and to TraffiCorp and by continuing to use the MFL credit cards for personal purchases. The Edwards were very successful in this diversion to the extent that they left MFL with $5.11 of assets by June 22, 2016." The court held that to allow the Edwards to escape personal liability would be to sanction an injustice and create an inequitable result.   The court's exercise of discretion in reaching this conclusion comports with Idaho law regulating its decision-making process.

*Lunneborg*, 421 P.3d 187, 201–202.

Here, Paradigm through Debtor used Plaintiffs' funds to service the MCAs,

resulting in the Paradigm Trust Account balance being insufficient to satisfy the

obligations due Plaintiffs.  Debtor then took the rent checks from Plaintiffs' tenants and

deposited them into two newly opened accounts for the purpose of operating a defunct

business that had its existing accounts frozen by the State TRO.  Debtor used those

accounts in such a way as to diminish their balances below $0, paying his employees and

himself.  In short, Debtor "drained [Paradigm of its] assets by diverting those assets and

income" to himself and to unauthorized uses.  Given Debtor's actions, to allow him to

"escape personal liability would be to sanction an injustice and create an inequitable

result."

Thus, both elements of the alter ego test are met, and this Court concludes that

Paradigm was Debtor's alter ego, and Paradigm's obligations and liabilities are thus

imputed to Debtor.

     B.    **Causes of action**

        1.       **Section 523(a)(2)(A)**

Plaintiffs argue Debtor made multiple statements and misrepresentations designed

to conceal the diversion of Plaintiffs' funds.  Section 523(a)(2)(A) excepts from

discharge "any debt . . . for money, property, services, or an extension, renewal, or

refinancing of credit, to the extent obtained by . . . false pretenses, a false representation,

or actual fraud, other than a statement respecting the debtor's or an insider's financial

condition."  To prove subparagraph A, a creditor must establish:

> (1) misrepresentation, fraudulent omission or deceptive conduct by the
> debtor; (2) knowledge of the falsity or deceptiveness of his statement or
> conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on
> the debtor's statement or conduct; and (5) damage to the creditor proximately
> caused by its reliance on the debtor's statement or conduct.

*Harmon v. Kobrin (In re Harmon)*, 250 F.3d 1240, 1246 (9th Cir. 2001).  With respect to

the element of proximate cause the creditor "must show that it had valuable collection

remedies at the time it agreed to renew its commitment to the debtor, and that those

remedies later became worthless," but need not show "that, had it not renewed its

commitment in reliance on the debtor's fraudulent statements, it would have exercised its

MEMORANDUM OF DECISION - 36

collection remedies in a sufficiently timely fashion to collect the debt." *Siriani v. Nw. Nat'l Ins. Co. (In re Siriani)*, 967 F.2d 302, 305 (9th Cir. 1992).

Debtor made multiple false statements to Uhlenhoff, the Herons, Wilson, and their respective entities. These statements were made to conceal Debtor's actions and material problems with Paradigm's operation, and for the purpose of continuing business with Plaintiffs and allowing the unauthorized use of Plaintiffs' funds. Debtor made multiple representations to Uhlenhoff and Brett Heron that, despite late payments of obligations, the funds in the trust accounts were safe and intact and the untimely payments were simply due to an employee's error. Debtor provided owner statements with inaccurate information indicating payments had been made to vendors, taxing authorities, insurance providers, and even the property owners themselves, when such payments had not been made. Debtor also provided owner statements that concealed markups of vendor expenses by listing only a total expense. Debtor did not disclose the actual amount billed by the vendor, even though he kept a ledger that identified the markups. Debtor told Wilson the reason for Paradigm's inability to provide owner's payments and accurate accounting information was due to an employee's error, even though that employee was actually fired for refusing to make a large adjustment to an owner statement. Debtor also promised Wilson he could and would wire transfer funds owed to Silver Fox, but he never made that transfer.

Debtor knew these statements were false or misleading, and these statements were made with the intent Plaintiffs would rely on them. Uhlenhoff, Wilson, and the Herons testified that they did rely on the truthfulness of the owner statements, and on Debtor's

MEMORANDUM OF DECISION - 37

statements about the safety and integrity of their funds.  Uhlenhoff and the Herons were

justified in their reliance since, in prior similar situations, the initial issues were small

and, when brought to Debtor's attention, they were plausibly explained and fixed.

Wilson's reliance was also justified since being told a bookkeeper had been fired would

plausibly explain Paradigm's inability to provide records.  Plaintiffs were harmed by

Debtor's misrepresentations and false statements because they continued their business

with Debtor and Paradigm.

Debtor correctly notes that a statement made respecting Debtor's or his insiders'

financial condition cannot support a § 523(a)(2)(A) claim, and he argues these statements

respect Paradigm's financial condition.[38]  The Supreme Court of the United States

recently interpreted § 523(a)(2)(A)'s phrase, "other than a statement respecting the

debtor's or an insider's financial condition" in *Lamar, Archer & Cofrin, LLP v. Appling*,

138 S. Ct. 1752 (2018).  The Court concluded "in a legal context [the term "respecting"]

generally has a broadening effect, ensuring that the scope of a provision covers not only

its subject but also matters relating to that subject."  *Id*. at 1760.  On this reasoning, the

Supreme Court held that "a statement is 'respecting' a debtor's financial condition if it

has a direct relation to or impact on the debtor's overall financial status."  *Id*. at 1761.

---

[38] Paradigm is an insider of Debtor under the Code's definition of "insider." "The term "insider" includes . . . if the debtor is an individual . . . [a] corporation of which the debtor is a director, officer, or person in control." § 101(31)(A).  LLCs fall into the Codes definition of "corporation."  *See* § 101(9)(A)(iv) ("The term 'corporation' includes . . . [an] unincorporated company or association"); *In re Rexford Properties, LLC*, 557 B.R. 788, 797 n.6 (Bankr. C.D. Cal. 2016); *see also, Crocker v. Matthews (In re Matthews)*, 599 B.R. 838, 864 n.59 (Bankr. D. Md. 2019) (citing *In re Longview Aluminum, LLC,* 657 F.3d 507, 509 n.1 (7th Cir. 2011)).

In this case, the statements outlined above did not have a direct relation to Debtor's or Paradigm's finances.  To the contrary, Debtor's statements regarding the integrity of the Plaintiffs' funds, the reason for late payments made on behalf of some Plaintiffs, and the owner statements, rent rolls, and cash flow statements are all statements made respecting *Plaintiffs' funds* not his or Paradigm's financial condition. Though some reason for the falsity of the statements undoubtedly related to Paradigm's financial distress, and accurate statements may have been alarming to Plaintiffs, funds held in trust on behalf of a third party would not ordinarily have a direct relation to or impact on the overall financial condition of the holder of such funds.  Thus, the Supreme Court's broad interpretation does not cover these statements.

Therefore, Debtor's debts, to the extent such debts were established at trial, are nondischargeable under the exception of § 523(a)(2)(A).[39]

## 2.      Section 523(a)(4) fraud or defalcation in a fiduciary capacity

Plaintiffs argue that Debtor's debts are nondischargeable under § 523(a)(4) because they are debts "for fraud or defalcation while acting in a fiduciary capacity."  To prevail on a cause of action under § 523(a)(4), Plaintiffs must not only show Debtor's fraud or defalcation, but also that Debtor was acting in a fiduciary capacity when he committed the fraud or defalcation.  *See Teichman v. Teichman (In re Teichman),* 774 F.2d 1395, 1398 (9th Cir.1985).

The definition of "fiduciary capacity" under § 523(a)(4) is a narrow one and is governed by federal law:

---

[39] The proven amount of such damages is set forth below, *see infra* § III.C.

MEMORANDUM OF DECISION - 39

> The broad, general definition of fiduciary—a relationship involving confidence, trust and good faith—is inapplicable in the dischargeability context. . . .  The fiduciary relationship must be one arising from an express or technical trust that was imposed before and without reference to the wrongdoing that caused the debt.

*Cal–Micro, Inc. v. Cantrell (In re Cantrell),* 329 F.3d 1119, 1125 (9th Cir. 2003) (internal citations omitted).  These requirements exclude constructive, resulting or implied trusts.  *See Ragsdale v. Haller,* 780 F.2d 794, 796 (9th Cir. 1986) (citing *Runnion v. Pedrazzini (In re Pedrazzini,* 644 F.2d 756, 759 (9th Cir. 1981)).

Additionally, while the meaning of "fiduciary capacity" is a question of federal law, state law is to be consulted to ascertain whether the requisite fiduciary relationship exists.  *Cantrell,* 329 F.3d at 1125 (9th Cir. 2003) (citing *Lewis v. Scott (In re Lewis),* 97 F.3d 1182, 1185 (9th Cir. 1996)).

*Murray v. Woodman (In re Woodman)*, 451 B.R. 31, 38–39 (Bankr. D. Idaho 2011).

In this case, Plaintiffs argue the agreements between each Plaintiff and Paradigm established a trust.  Plaintiffs also argue that a trust for the purpose of § 523(a)(4) was created upon receipt of tenant security deposits because Idaho Code § 6-321 imposes fiduciary-like restrictions on the retention of a security deposit.

Though Plaintiffs' arguments would appear to ignore the separation between Paradigm and Debtor, since Plaintiffs established Paradigm was Debtor's alter ego, liability can be imposed on Debtor personally if the requisite fiduciary relationships between Paradigm and Plaintiffs are established.  This requires evaluation of each Plaintiff's proof.

### a.     Silver Fox and Trestles

There are no express trusts between Paradigm and Silver Fox or Trestles, as there is no evidence of the terms of the contract between Paradigm and Trestles, and no

MEMORANDUM OF DECISION - 40

evidence of a contract between Paradigm and Silver Fox, that would create such express trusts. As noted, Plaintiffs argue a trust was created upon receipt of the tenants' security deposits since Idaho Code § 6-321 imposes fiduciary-like restrictions on the retention of those security deposits. This argument, however, ignores the fact that any fiduciary relationship created under Idaho Code § 6-321 is between the property owner and the tenant. Any implied fiduciary obligation between the agent property management company and the principal property owner arising under Idaho Code § 6-321 is insufficient to create a fiduciary relationship sufficient to satisfy § 523(a)(4). *Woodman*, 451 B.R. at 41 (concluding that an agency relationship between a property management company and a property owner "does not impose the type of trust required under § 523(a)(4)"). As Trestles and Silver Fox failed to establish a fiduciary relationship sufficient for the purposes of § 523(a)(4), they have not carried their burden on the fiduciary fraud or defalcation exception to discharge.

### b.    EUDA, EJC, Oaklands, T Street, Doheny, and the Heron Trust

Plaintiffs established express trusts were created by the terms of the property management agreements between Paradigm and EUDA, EJC, Oaklands, T Street, Doheny, and the Heron Trust. These contracts required Paradigm to put Plaintiffs' funds in a separate trust account, and to use the funds on behalf of the owner, and only in a manner authorized by the agreement. Thus, § 523(a)(4) applies, and the Court evaluates whether these Plaintiffs (EUDA, EJC, Oaklands, T Street, Doheny, and the Heron Trust) established the elements of fraud or defalcation under § 523(a)(4).

### i.   "Fraud"

"'Fraud' under § 523(a)(4) means actual fraud." *Honkanen v. Hopper (In re Honkanen)*, 446 B.R. 373, 382–83 (9th Cir. BAP 2011) (citing *Roussos v. Michaelides (In re Roussos),* 251 B.R. 86, 91 (9th Cir. BAP 2000)).  "The definition of "fraud" for purposes of 523(a)(4) is the same as fraud with respect to 523(a)(2)."  *In re Chavez*, 140 B.R. 413, 423 (Bankr. W.D. Tex. 1992).  Thus, a creditor must establish:

> (1) misrepresentation, fraudulent omission or deceptive conduct by the debtor; (2) knowledge of the falsity or deceptiveness of his statement or conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on the debtor's statement or conduct; and (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct.

*Harmon*, 250 F.3d at 1246.  Further, in addressing "actual fraud" under § 523(a)(2)(A), the United States Supreme Court explained in *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581 (2016):

> "Actual fraud" has two parts: actual and fraud.  The word "actual" has a simple meaning in the context of common-law fraud: *It denotes any fraud that "involv[es] moral turpitude or intentional wrong."  Neal v. Clark,* 95 U.S. 704, 709 (1878).  "Actual" fraud stands in contrast to "implied" fraud or fraud "in law," which describe acts of deception that "may exist without the imputation of bad faith or immorality." *Ibid. Thus, anything that counts as "fraud" and is done with wrongful intent is "actual fraud."*

*Id.* at 1586 (emphasis added).

Here, Debtor's misrepresentations considered previously under § 523(a)(2)(A)—excuses about tardy payments, falsified owner statements, and excuses about Paradigm's inability to reconcile its books—are sufficient to satisfy § 523(a)(4).  Debtor misled Plaintiffs in order to continue his business and conceal the misuse and misappropriation of Plaintiffs' monies.  In so doing, Debtor committed fraud with wrongful intent—"actual

fraud"—and EUDA, EJC, Oaklands, T Street, Doheny, and the Heron Trust have proven fraud for the purpose of § 523(a)(4).

Therefore, the debts, to the extent such debts were established at trial, with respect to EUDA, EJC, Oaklands, T Street, Doheny, and the Heron Trust are nondischargeable under the fiduciary fraud exception of § 523(a)(4).[40]

### ii.    "Defalcation"

"[F]or purposes of § 523(a)(4), 'defalcation' means either a 'misappropriation of trust funds or money held in any fiduciary capacity' or a 'failure to properly account for such funds.'"  *Castillo v. Akers (In re Castillo)*, 2012 WL 3641510, at *6 (9th Cir. BAP Aug. 24, 2012) (citing *Blyler, et al. v. Hemmeter (In re Hemmeter),* 242 F.3d 1186, 1190 (9th Cir. 2001)).  The United States Supreme Court explained in *Bullock v. BankChampaign, N.A.*, 569 U.S. 267 (2013):

> [W]here the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, [defalcation] requires an intentional wrong.  We include as intentional not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent.  Thus, we include reckless conduct of the kind set forth in the Model Penal Code.  Where actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if the fiduciary "consciously disregards" (or is willfully blind to) "a substantial and unjustifiable risk" that his conduct will turn out to violate a fiduciary duty.  ALI, Model Penal Code § 2.02(2)(c), p. 226 (1985).  See *id.,* § 2.02 Comment 9, at 248 (explaining that the Model Penal Code's definition of "knowledge" was designed to include "'wilful blindness'").  That risk "must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves *a gross deviation* from the standard of conduct that a law-abiding person would observe in the actor's situation." *Id.,* § 2.02(2)(c), at 226 (emphasis added).  *Cf. Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194, n. 12, 96 S. Ct. 1375, 47 L.Ed.2d 668 (1976) (defining scienter

---

[40] The proven amount of such damages is set forth below, *see infra* § III.C.

for securities law purposes as "a mental state embracing intent to deceive, manipulate, or defraud").

*Id.* at 273–74.

Here, Debtor knowingly pledged the funds in the Paradigm Trust Account to multiple MCA financers. Debtor knew Paradigm's operating account lacked cash flow to service the MCAs and that the Paradigm Trust Account was marginally sufficient to fund them. Debtor's use of these trust funds breached the terms of the Plaintiffs' contracts and Paradigm's fiduciary obligations to the property owners. This conduct resulted in the substantial depletion of the Paradigm Trust Account.

Debtor knew or should have known that obligating the Paradigm Trust Account to MCA financers would result in significant depletion of the funds held therein. Debtor took a substantial and unjustified risk in directing Paradigm to repeatedly enter into this unsustainable financing alternative (and at times Rentmaster as obligor though the funds were to benefit Paradigm), and his course of action was a gross deviation from that in which a reasonable person in his situation would engage.

Thus, EUDA, EJC, Oaklands, T Street, Doheny, and the Heron Trust have established the elements of the fiduciary defalcation exception to discharge under § 523(a)(4), and Debtor's debts are nondischargeable.[41]

### 3.   Section 523(a)(4) embezzlement

Section 523(a)(4) excepts from discharge "any debt . . . for . . . embezzlement." This Court explained in *Woodman*, 451 B.R. at 41:

---

[41] The proven amount of such damages is set forth below, *see infra* § III.C.

MEMORANDUM OF DECISION - 44

Embezzlement under § 523(a)(4) does not require the existence of a fiduciary relationship. *Transamerica Commercial Fin. Corp. v. Littleton (In re Littleton),* 942 F.2d 551, 555 (9th Cir. 1991).

In the nondischargeability context, embezzlement is defined as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Id.* Thus, three elements are required to show embezzlement: "(1) property rightfully in the possession of a nonowner; (2) nonowner's appropriation of the property to a use other than which it was entrusted; and (3) circumstances indicating fraud." *Id.; First Del. Life Ins. Co. v. Wada (In re Wada),* 210 B.R. 572, 576 (9th Cir. BAP 1997).

In *Woodman*, there was a multi-tiered LLC structure with the debtors as members of an LLC which was itself the managing member of a property management LLC that managed the plaintiff's mobile home park. *Id.* at 35–37. The plaintiff did not receive two months of rents collected by the property management company. *Id.* at 37. When the debtors filed bankruptcy, the plaintiff brought an adversary proceeding under § 523(a)(2), (4), and (6). *Id.* The Court found that the debtors, as members of the managing member of the property management company, had rightful possession of the rents and deposit receipts entrusted to the property management company by the plaintiff's tenants. *Id.* at 43. This relationship between the debtors and the property owner, though attenuated, was sufficient to establish the first element of embezzlement—property in the rightful possession of a nonowner—for the purposes of determining nondischargeability under § 523(a)(4). *Id.*

Paradigm's contracts with EUDA, EJC, Oaklands, T Street, Doheny, and the Heron Trust creates an agency between Paradigm and said Plaintiffs. Exs. 1041-1, 1042-1, 1043-1, 1044-1, 1045-1, 1046-1, and 1063-1. Debtor, as Paradigm's managing

MEMORANDUM OF DECISION - 45

member, *see* Ex. 1016,[42] was therefore initially in rightful possession of the monies of

EUDA, EJC, Oaklands, T Street, Doheny, and the Heron Trust, as these Plaintiffs

entrusted to Paradigm their owner reserves, tenants' rents, and security deposits to

Paradigm as their agent.  Further, since Plaintiffs established that Paradigm was the alter

ego of Jaques, Paradigm's lawful possession of Plaintiffs' monies establishes the first

prong.

Though the terms of the Trestles contract were not proven, and the existence of a

contract between Silver Fox and Paradigm was not proven, the owner statements, rent

rolls, and cash flow statements provided by Debtor to both Trestles and Silver Fox are

evidence that Paradigm had possession of tenant rents and security deposits of Trestles

and Silver Fox.[43]  *See generally* Ex. 1054 at 65-85; Ex. 1108; Ex. 1109.  It is also clear

from the testimony of Uhlenhoff and Wilson that Paradigm's possession of these funds

was initially authorized.  Thus, the evidence establishes that Debtor was initially in

lawful possession of Plaintiffs' monies.

---

[42] The Idaho Supreme Court has not addressed the issue of actual authority of member-managers under Chapter 25 of Title 30 of the Idaho Code, which replaced the prior Idaho LLC statute, Chapter 6 of Title 30 of the Idaho Code, in 2015.  Idaho Code § 30-25-301(a) provides: "a member is not an agent of a limited liability company solely by reason of being a member."  The Official Comments to Idaho Code § 30-25-407 explain that the actual authority of a managing member of a manager-managed LLC with one managing member is generally governed by the operating agreement of the LLC and gap-filled by the provisions of the LLC statute—here, Idaho Code § 30-25-407(c).  *See also* Idaho Code § 30-25-105(a)–(b) (defining the scope of the operating agreement and the gap-filling nature of the LLC statute).  Paradigm's operating agreement is not in evidence.  Nevertheless, Debtor's testimony established that he acted on behalf of Paradigm as its managing member, directing the company in the ordinary course of business and controlling the accounting and finances of Paradigm.

[43] For the purposes of § 523(a)(4) embezzlement, no trust relationship is required, so Trestles and Silver Fox need only show that Debtor had lawful possession of their funds.  *Woodman*, 451 B.R. at 41.

MEMORANDUM OF DECISION - 46

Debtor then appropriated Plaintiffs' monies to a use other than which they were entrusted when Debtor pledged the funds to obtain financing to buyout a member of Paradigm.  He authorized multiple MCAs to make daily withdrawals from the Paradigm accounts where Plaintiffs' funds were held.  In addition, with respect to T Street, Doheny, and the Heron Trust, Debtor appropriated Plaintiffs' funds by charging unauthorized markups for vendor services.

The last element of embezzlement—circumstances indicating fraud—is established by (i) Debtor's admissions that he lied to clients in order to keep their business; (ii) the falsified documents provided to the Heron Trust; (iii) the repeated false excuses about check numbers, account errors, and employee errors; (iv) the owner statements that concealed markups and charged for unpaid expenses; (v) the use of funds from his other businesses and his personal account to satisfy obligations that Paradigm had insufficient funds to satisfy, when his communications to Plaintiffs suggested the payment was made in the ordinary course of business; and (vi) the post-TRO creation, funding, and draining of new Paradigm accounts.

As Plaintiffs have established the elements of embezzlement under § 523(a)(4), Debtor's debts, to the extent such debts were established at trial, are nondischargeable.[44]

---

[44] The proven amount of such damages is set forth below, *see infra* § III.C.

MEMORANDUM OF DECISION - 47

C.      **Damages**

1.      **June 2018 Owner Reserves, Security Deposits, and Rents**

a.      **Uhlenhoff Entities**

Exhibit 1054 contains owner statements and rent rolls for each Uhlenhoff entity. They show the amount in owner reserves, rents, and security deposits that should have been held by Paradigm at the end of May 2018 for each entity.  By its own account, Paradigm should have held $5,525 in trust on behalf of EUDA.[45]  Paradigm should have held $14,040 in trust on behalf of EJC.[46]  Paradigm should have held $44,090.50 in trust on behalf of Doheny.[47]  Paradigm should have held $3,150 in trust on behalf of Oaklands.[48]  Paradigm should have held $34,029.29 in trust on behalf of T Street.[49] Paradigm owed $31,140 to Trestles.[50]  The Paradigm's accounts held insufficient funds to pay the sums owed these Plaintiffs, and none of these amounts were paid.

---

[45] An owner's reserve balance of $500, Ex. 1054-17; tenant rents of $2,825, Ex. 1054-19; and security deposits of $2,200, Ex. 1054-19.

[46] An owner's reserve balance of $1,000, Ex. 1054 at 21, 25, tenant rents of $6,040, Ex. 1054 at 23, 29; and security deposits of $7,000, Ex. 1054 at 23, 29.

[47] An owner's reserve balance of $3,023, Ex. 1054-41; tenant rents of $17,217.50, Ex. 1054-43; and security deposits of $23,850, Ex. 1054-43.

[48] An owner's reserve balance of $500, Ex. 1054-41; tenant rents of $1,450, Ex. 1054-47; and security deposits of $1,200, Ex. 1054-47.

[49] An owner's reserve balance of $4,019.29, Ex. 1054 at 51, 61; tenant rents of $15,945, Ex. 1054 at 53, 63; and security deposits of $14,065, Ex. 1054 at 53, 63.

[50] An owner's reserve balance of $2,000, Ex. 1054 at 65, 71, 75, 81; tenant rents of $14,375, Ex. 1054 at 67, 73, 79, 85; and security deposits of $14,765, Ex. 1054 at 67, 73, 79, 85.

### b.    The Heron Trust

### i.    Owner Reserves and Rents

Exhibit 1094 includes one page from Paradigm's general ledger relating to the

Heron Trust with dates from June 7, 2018, to June 8, 2018.  Tammara Heron used the

balances on this page to calculate the amount that should have been held in reserve.

Tammara Heron testified that a $30,883 mortgage payment was made on behalf of the

Heron Trust.  Therefore, she subtracted $30,883 from the ending balance of $122,930.93

on June 8, 2018, to obtain a purported reserve amount of $92,047.93.  Ex. 1094-4.

Though the balance of $92,047.93 far exceeds the $50,000 Tammara Heron testified to

keeping in reserve with Paradigm, Tammara Heron explained that this figure also

included the tenant rent checks received as of June 8, 2018.  Thus, the Heron Trust

calculates $92,047.93 in owner reserves and rents that was supposed to be held in trust by

Paradigm.

### ii.    Security Deposits

Tammara Heron also argues the Heron Trust is entitled to $65,175 in lost security

deposits.  She argues Exhibit 1065 evidences the security deposits that should have been

held in trust by Paradigm.  *See* Doc. No. 53 at 32.  Exhibit 1065 includes the rent roll for

the Heron Property for the month of March 2018.  *Ex.* 1065 at 3–5.  As of March 31,

2018, the Heron Trust had $65,175.00 in security deposits.  *Id.* at 5.  There is no other

testimony or documentary evidence showing the amount of security deposits held by

Paradigm on behalf of the Heron Trust.  The Court cannot conclude from this record that

the Heron Trust suffered damages in this amount.  The exhibit provides only a snapshot

of the amount of security deposits held as of March 31, 2018.  There was no evidence

proffered in regard to deposits returned to, or withheld from, tenants at move out

following March 31, 2018.  Thus, this does not clearly establish the amount of security

deposits that should have been held in trust by Paradigm in June 2018, when it became

apparent the Paradigm Trust Account held insufficient funds and the Heron Trust

terminated its contract with Paradigm.  Nor does other evidence establish this figure.

### c.    Silver Fox

Silver Fox argues it is entitled to damages for tenant rents and deposits lost as a

result of Debtor's actions.  While Silver Fox asserts Ex. 1108-17 establishes the rents and

security deposits owed it on June 2018, Exhibit 1108-17 is a rent roll showing rents and

deposits as of December 31, 2017.  Doc. No. 53 at 22.  Silver Fox attempts to explain in

its closing argument the changes in the deposited amounts between December 2017 and

June 2018.  *Id.*  However, there was no evidence admitted at trial that supports this

argument.  Without such evidence, Plaintiffs' calculation of the rents and security

deposits as of June 2018 from financial documents detailing 2017's rents and security

deposits is conjectural.

### 2.    The Heron Trust's Extra Insurance Premium

The Heron Trust identified incorrect entries for the insurance premiums paid by

Paradigm in a cash flow statement printed by Sarah Phillips on June 6, 2018, Ex. 1094-2.

The February 2018 entry indicated that Paradigm expended $9,444 for insurance

premiums, but the April 2018 statement from the insurance company indicated a

remaining balance of $3,148 on February 28, 2018, and a $3,148 payment on March 12,

2018. Ex. 1091-2. Thus, nothing was paid in February 2018. These errors are also apparent in an excerpt from the general ledger dealing with the Heron Trust's insurance premiums.[51] Ex. 1095-1. Paradigm reported that it expended $15,740 for insurance premiums on behalf of the Heron Trust, *see* Exs. 1094-2 and 1095-1, when, in reality, Paradigm only expended $12,592.[52] The effect of these accounting errors reduced the amount the Heron Trust should have received as an owner payment by $3,148.00.

### 3.    The Heron Trust Property Taxes

The chapter 7 trustee successfully avoided the December 2017 property tax payment to Ada County by Debtor on behalf of the Heron Trust in an adversary proceeding under §§ 547, 548, and 550. *Hopkins v. Ada Cty. (In re Jaques)*, No. 19-06001-TLM, Doc. No. 32 (Bankr. D. Idaho 2019). Tammara Heron testified that, consequently, the Heron Trust had to pay these taxes and late fees again. Debtor argues that the property tax payment was always owed to Ada County by the Heron Trust, and that the Heron Trust is only damaged by the late fees. However, The Heron Trust's prior owner statement showed that funds previously due the Heron Trust were reduced by the property tax payment. Ex. 1069-9. Since Paradigm never made the property tax payment, and Debtor's attempt to make the payment with his personal funds was undone

---

[51] Though Plaintiffs make reference to supportive assertions made in Ex. 1092, that exhibit was introduced at trial over a hearsay objection for the sole purpose of evidencing receipt of certain information, and with the express exclusion of use of the exhibit for the truth of the matters asserted therein. Thus, the Court draws its conclusions from other available evidence.

[52] $3,148 in January, Ex. 1086-3; $3,148 March, Ex. 1091-2; $6,296 on May 1, 2018, Ex. 1093-1.

by the trustee's avoidance and recovery of those funds, the Heron Trust is entitled to the

entire amount of the taxes and the late fees of $65,083.49.

### 4.     Vendor markups

Plaintiffs contend Paradigm levied unauthorized markups on maintenance or

vendor charges that were not clearly identified in their owner statements.  Debtor testified

that it was Paradigm's standard practice to markup vendor expenses.  Jason Hall,

Paradigm's general manager, testified that Debtor informed him of Paradigm's

maintenance markup policies on his first day of employment and emphasized the

importance of making money in the maintenance business.  Debtor did not inform Hall

that certain properties could not be marked up based on variations in the management

agreements.  Wendy Lawrence, Paradigm's bookkeeper, testified that Paradigm would

markup maintenance bills and other work performed upon a tenant's moveout by billing

such work directly to the owners at a higher, and fictitious, cost, and the vendor would

pay a kick back to Paradigm.  These vendors included Triple A Pest Control, System

Kleen, RKH Landscaping, and an unnamed plumbing company.  Paradigm's general

ledger reveals the portion of each vendor charge that constitutes a markup added to the

actual expense for the vendors' services.  *See generally* Exs. 1055 and 1101.

### a.     Uhlenhoff Entities

The contracts for Oaklands, EJC, and EUDA allowed for a 20 percent markup.

*See generally* Exs. 1042-3, 1043-3, 1044-3, and 1046-3.  However, the record establishes

Paradigm was not entitled to markup any services for the properties owned by T Street or

Doheny.  *See generally* Exs. 1041 and 1045.  Yet, a portion of Paradigm's general ledger

for the Uhlenhoff Entities itemizes the $4,059.56 in markups on vendor services for the T Street properties, Ex. 1055 at 44–54, and $12,179.99 in markups for vendor services for the Doheny properties, Ex. 1055-23. Such improper markups are damages to these Plaintiffs.

Trestles argues it was entitled to damages for the unauthorized markup of vendor services. However, Trestles failed to establish the terms of its contract which prohibit Paradigm from marking up the expense of vendor services. While it is evident that Paradigm did markup such expenses, without evidence of the contract terms, the Court cannot conclude that such markups were improper.

### b.    The Heron Trust

Though the contract between Paradigm and the Heron Trust only allowed for a 7% vendor markup on renovation, modernization, or capital improvements requested by the Heron Trust, Ex. 1063-4, Paradigm marked up vendor services without notation regarding renovation, modernization, capital improvement, or other services. Sarah Phillips, Paradigm's receptionist and leasing agent, provided the Heron Trust with a general ledger that included vendor markups that were not clearly identified as such in the Heron Trust's owner statements. Ex. 1101. Between July 11, 2017, and June 1, 2018, Paradigm marked up maintenance and vendor expenses by $892.48. *Id*. at 1–5.

The Heron Trust failed to establish that all of these markups were improper. Certain services listed in the general ledger appear to fall into the categories of renovation, modernization, or capital improvement. The Heron Trust failed to demonstrate that these services actually fall outside such categories. Such services

include replacement of an insulated glass unit—marked up $23.68—and exterior paint work—marked up $50. Ex. 1101 at 3–4. The Heron Trust also failed to establish that those services were not performed at the Heron Trust's request. Thus, the Heron Trust has failed to establish that $76.68 in markups were not authorized under its contract with Paradigm. The remaining markups of $815.80 were unauthorized and are appropriate as damages.

Tammara Heron also seeks damages for markups on the cost of the services of Columbia Debt Recovery. Debtor contracted with Columbia Debt Recovery on behalf of the Heron Trust. Exs. 1102–1103. The Heron Trust did not present sufficient evidence of markups on the Columbia Debt Recovery services, and no damages will be awarded therefor.[53]

### c. Silver Fox

Silver Fox argues it is entitled to damages for the unauthorized markup of vendor services. However, Silver Fox failed to establish the existence of a contract or any agreement where Paradigm was prohibited from marking up vendor services, and Wilson's testimony regarding the same is insufficient to establish that vendor markups were improper. While it is evident that Paradigm did markup vendor expenses, the Court cannot conclude that such markups were improper.

### 5. Summary of Total Damages Awarded

Damages, as established by Plaintiffs, will be awarded in the following particulars:

---

[53] Tammara Heron also claimed Debtor marked up expenses for M & T Patrol Services, but she points to no documentary evidence establishing such markup, nor the amount thereof.

MEMORANDUM OF DECISION - 54

EUDA:

- Owner's reserve balance ..........................................$500.00[54]
- Tenant rents ......................................................$2,825.00[55]
- Security deposits...............................................$2,200.00[56]
- Total..................................................................$5,525.00

EJC:

- Owner's reserve balance ....................................$1,000.00[57]
- Tenant rents ......................................................$6,040.00[58]
- Security deposits...............................................$7,000.00[59]
- Total................................................................$14,040.00.

Doheny:

- Owner's reserve balance ....................................$3,023.00[60]
- Tenant rents ....................................................$17,217.50[61]
- Security deposits.............................................$23,850.00[62]
- Unauthorized markups ......................................$12,179.99[63]
- Total................................................................$56,270.49.

Oaklands:

- Owner's reserve balance ........................................$500.00[64]
- Tenant rents ......................................................$1,450.00[65]

---

[54] Ex. 1054-17.

[55] *Id.* at 19.

[56] *Id.* at 19.

[57] *Id.* at 21, 25.

[58] *Id.* at 23, 29.

[59] *Id.* at 23, 29.

[60] *Id.* at 41.

[61] *Id.* at 43.

[62] *Id.* at 43.

[63] Ex. 1055-23.

[64] Ex. 1054-41.

[65] *Id.* at 47.

MEMORANDUM OF DECISION - 55

- Security deposits....................................................$1,200.00[66]
- Total.......................................................................$3,150.00.

T Street:

- Owner's reserve balance ........................................$4,019.29[67]
- Tenant rents .........................................................$15,945.00[68]
- Security deposits...................................................$14,065.00[69]
- Unauthorized markups ...........................................$4,059.56[70]
- Total.....................................................................$38,088.85.

Trestles:[71]

- Owner's reserve balance ........................................$2,000.00[72]
- Tenant rents .........................................................$14,375.00[73]
- Security deposits...................................................$14,765.00[74]
- Unauthorized Markups ................................................$0.00
- Total.....................................................................$31,140.00.

Tammara Heron, on behalf of the Heron Trust:

- Security deposits............................................................$0.00
- Owner distribution...............................................$42,341.26[75]
- Unauthorized markups .............................................$815.80[76]

---

[66] *Id.* at 47.

[67] *Id.* at 51, 61.

[68] *Id.* at 53, 63.

[69] *Id.* at 53, 63

[70] Ex. 1055 at 44–54

[71] Though the terms of the contract between Trestles and Paradigm were not established, the owner statements and rent rolls provided by Paradigm to Trestles, *see* Ex. 1054 at 65–85, evidence the amount Paradigm owed Trestles.

[72] Ex. 1054 at 65, 71, 75, 81.

[73] *Id.* at 67, 73, 79, 85.

[74] *Id.* at 67, 73, 79, 85.

[75] Ex. 1066-6.

[76] Ex. 1101 at 1–5.

MEMORANDUM OF DECISION - 56

- Extra insurance premium........................................$3,148.00[77]
- Owner reserves and rent .......................................$92,047.93[78]
- Property taxes and late fees ...................................$65,083.49
- Columbia debt recovery ..................................................$0.00
- Total..................................................................$203,436.48.

Silver Fox:[79]

- Security deposits..............................................................$0.00
- June 2018 tenant rent.......................................................$0.00
- Owner distribution.............................................$35,755.28[80]
- May 2018 ending cash balance ...........................$3,310.00[81]
- Unauthorized vendor markups ......................................$0.00
- Total....................................................................$39,065.28.

## D.    **Attorneys' Fees and Costs**

Plaintiffs request an award of attorneys' fees and costs under Idaho Code §§ 12-120 and 12-121, and Idaho R. Civ. P. 54. This Court previously explained:

> Plaintiffs may recover attorney's fees incurred in connection with their 523(a) . . . litigation if they "would be entitled to fees in state court for establishing those elements of the claim which the bankruptcy court finds support a conclusion of nondischargeability." [*Kilborn v. Haun (In re Haun),* 396 B.R. 522, 530 (Bankr. D. Idaho 2008)]. Plaintiffs assert that they would be entitled to fees in state court under Idaho Code § 12–120(3) because this proceeding arose out of a "commercial transaction."

Idaho Code § 12–120(3) provides:

> In any civil action to recover on an open account, account stated, note, bill, negotiable instrument, guaranty, or contract relating to the purchase or sale of goods, wares, merchandise,

---

[77] *See* discussion *supra* § III.C.2.

[78] Ex. 1094-4.

[79] Though the existence of a contract between Silver Fox and Paradigm was not established, the owner statement and cash flow statement provided by Paradigm to Silver Fox on June 4, 2018, evidence the amount Paradigm owed Silver Fox. Ex. 1109.

[80] Ex. 1109-4.

[81] Ex. 1109-4.

> or services *and in any commercial transaction* unless
> otherwise provided by law, the prevailing party shall be
> allowed a reasonable attorney's fee to be set by the court, to be
> taxed and collected as costs.

(Emphasis added.)   To award fees under this provision, the Court must determine if Plaintiffs are a prevailing party and whether the gravamen of the § 523(a)(2)(B) litigation dealt with a "commercial transaction." *Haun,* 396 B.R. at 530. "Neither the absence of a proven contract, nor the fact that [Plaintiffs'] claim is based on fraud, precludes operation of Idaho Code § 12–120(3)." *Id.* (citing *Blimka v. My Web Wholesaler, LLC,* 152 P.3d 594, 599–600 (2007)).

. . .

"Commercial transaction" is defined by the Idaho Code as "all transactions except transactions for personal or household purposes." Idaho Code § 12–120(3).

*Optekar v. Tickemyer (In re Tickemyer)*, 2011 WL 1230326, at *10–11 (Bankr. D. Idaho Mar. 31, 2011).

Here, Plaintiffs prevailed in establishing their claims and the nondischargeability thereof.  In addition, Plaintiffs' claims were commercial in nature as the claims arose from Debtor's contractual obligations and commercial services.  Therefore, Plaintiffs are entitled to attorneys' fees under Idaho Code § 12-120.[82]  Plaintiffs shall submit their affidavit of attorneys' fees within fourteen (14) days.  Debtor shall have fourteen (14) days to respond, after which the Court will consider the submissions without oral

---

[82] The Court does not find from the evidence presented at trial that Debtor defended this case frivolously, unreasonably, or without foundation, so attorney's fees are not awarded under Idaho Code § 12-121.  *Haun,* 396 B.R. at 529 (quoting Idaho R. Civ. P. 54(e)(1)).

MEMORANDUM OF DECISION - 58

argument and determine and award appropriate fees.  Plaintiffs are also entitled to costs under Rule 7054(b).[83]

## IV.   CONCLUSION

Plaintiffs established that debts owed them by Debtor in the foregoing particulars are nondischargeable under §§ 523(a)(2) and (4).  The Court will enter an appropriate judgment once attorneys' fees are established.

DATED:  March 12, 2020



TERRY L. MYERS
U.S. BANKRUPTCY JUDGE

---

[83] Plaintiffs must submit a cost bill in accordance with LBR 7054.1.

MEMORANDUM OF DECISION - 59